William A. Kershaw (State Bar No. 057486)
Stuart C. Talley (State Bar No. 180374)
**KERSHAW, COOK & TALLEY PC**
401 Watt Avenue
Sacramento, California  95864
Telephone: (916) 779-7000
Facsimile:  (916) 721-2501
Email: bill@kctlegal.com
Email: stuart@kctlegal.com

Joseph A. Osborne (*Pro hac vice to be filed*)
**OSBORNE & ASSOCIATES LAW FIRM, P.A.**
433 Plaza Real, Suite 271
Boca Raton, FL 33432
Telephone: (561) 293-2600
Facsimile:  (561) 923-8100
Email: josborne@oa-lawfirm.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BURKHART,<br><br>               Plaintiff,<br><br>        v.<br><br>WRIGHT MEDICAL TECHNOLOGY, INC., a Delaware corporation; WRIGHT MEDICAL GROUP, INC., a Delaware corporation; MICROPORT ORTHOPEDICS, INC., a Delaware corporation; and DOES 1-10,<br><br>               Defendants. | CASE NO. _____<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Strict Products Liability Manufacturing Defect**<br>2. **Strict Products Liability – Failure to Warn**<br>3. **Negligence**<br>4. **Negligence – Failure to Recall/Retrofit**<br>5. **Fraudulent Misrepresentation**<br>6. **Fraudulent Concealment**<br>7. **Negligent Misrepresentation**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW the Plaintiff, Kimberly Burkhart, by and through her attorneys of record to allege the following causes of action against Defendants, and each of them, as follows:

## NATURE OF THE ACTION

1.      Defendants have known for several years that their hip replacement device – the PROFEMUR® Total Hip System with PROFEMUR® Stem (the "Stem") and PRO FEMUR® Neck (the "Neck") (collectively referred to as "the PRO FEMUR® Total Hip System" or "the Device") - was prone to prematurely fail.  Specifically, the Stem and Neck of Defendants' Device is prone to corrosion to the point where the Device has a tendency to fracture at the location of the highest tensile stress concentration in the Neck-Stem-body transition during even low to moderate physical activity. As a result of the Device's defects and Defendants' tortious acts/omissions, Plaintiff Kimberly Burkhart, and many other patients who received these devices, endured unnecessary pain and suffering; debilitating lack of mobility; and a subsequent more difficult revision surgery to replace the faulty Device, giving rise to more pain and suffering, prolonged recovery time, and increased risk of complications and death from surgery.

2.      Plaintiff Kimberly Burkhart has suffered from unnecessary pain, debilitation, hospitalization, and the need to undergo subsequent revision surgery because Defendant's defectively designed the Device and failed to adequately warn of the dangers of the Device. Significantly, consequent to reports of complaints of the defects in and fractures of the Device, Defendants have ceased marketing the Device.

## PARTIES

3.      Plaintiff Kimberly Burkhart (hereinafter "Plaintiff') is, and all times relevant hereto was, a resident and citizen of Los Angeles County, California. Plaintiff underwent a left total hip arthroplasty on February 12, 2013. At that time, the PROFEMUR® Total Hip System manufactured, designed, distributed, and

warranted by Defendants was implanted into Plaintiff. Plaintiff's surgeon, medical staff, and other healthcare providers met or exceeded the standard of care applicable to the hip replacement surgery. The PROFEMUR® Total Hip System implanted on Plaintiff's left side subsequently failed and had to be revised.

4.     Defendant Wright Medical Technology, Inc. (hereinafter "Wright Technology") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Memphis, Tennessee, and as such is a citizen of both the State of Tennessee and the State of Delaware. Defendant Wright Technology is registered to do business in the State of Tennessee, and may be served with process by serving its registered agent for service, Corporation Service Company, at 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

5.     Defendant Wright Medical Group, Inc. (hereinafter "Wright Group") is a corporation organized under the laws of the State of Delaware, with its headquarters and principal place of business located in Memphis, Tennessee, and as such is a citizen of both the State of Tennessee and the State of Delaware. Defendant Wright Group is authorized to do business in Tennessee and may be served with process by serving its registered agent for service, Corporation Service Company, at 2908 Poston Avenue, 23 Nashville, Tennessee 37203-1312.

6.     Defendant Wright Technology is a wholly owned subsidiary of Defendant, Wright Group (collectively "Wright").

7.     Defendant MicroPort Orthopedics, Inc. (hereinafter "MicroPort") is a corporation organized under the laws of the State of Delaware, with its headquarters and principal place of business located in Arlington, Tennessee, and as such is a citizen of the State of Tennessee and the State of Delaware. Defendant MicroPort is registered to do business in the State of Tennessee, and may be served with process by serving its registered agent for service, the CT Corporation System, at 800 S. Gay St., Suite 2021, Knoxville, Tennessee 37929-9710.

8.     At all times relevant hereto, Defendants were engaged in the business

of designing, licensing, manufacturing, distributing, selling, marketing and/ or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, numerous prosthetic orthopedic products, including the Wright Medical PROFEMUR® Total Hip System.

9.    Defendants were also involved in the business of monitoring and reporting adverse events concerning the Wright Medical PROFEMUR® Total Hip System, and participated in the decision process and response, if any, related to these adverse events.

10.    Defendants Wright Group, Wright Technology, and MicroPort are collectively referred to herein as "Defendants". At all times relevant herein, each of the named Defendants were the representatives, agents, employees, co-conspirators, servants, employees, partners, joint-venturers, franchisees, or alter egos of the other and was acting within the scope of this respective authority by virtue of those interrelationships.

11.    The identities and capacities of Defendants DOES 1 through 10 are currently unknown to Plaintiff. Said Defendants are therefore sued by such fictitious names as individuals or entities of unknown form and of unknown capacity who, upon information and belief, are parties whose acts and/or omissions caused or contributed to cause the tortious conduct set forth in this pleading and who proximately and legally caused the resulting injuries and damages to Plaintiff as alleged herein. When the true names and capacities of the Defendants sued herein as DOES are ascertained, Plaintiff will amend this action accordingly.

## JURISDICTION AND VENUE

12.    Plaintiff brings his complaint under federal diversity jurisdiction, 28 U.S.C. § 1332, because the Parties are completely diverse in citizenship, as Plaintiff is a California citizen and Defendants are citizens of both Tennessee and Delaware, and the amount in controversy exceeds $75,000.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a) and

(c), as a substantial part of the events giving rise to this claim occurred in the State of California.

## STATEMENT OF FACTS

14.    In December 1999, Wright acquired a European manufacturer of artificial hip devices known as Cremascoli Ortho ("Cremascoli") which had designed and manufactured artificial hips with a modular neck component since approximately the year 1985.

15.    Pursuant to the Section 510(k) Premarket Notification Process, on December 13, 2000, Wright received permission from the United States Food and Drug Administration (FDA) to distribute in the United States its first modular neck and stem artificial hips - its PROFEMUR® Hip System, the Devices at issue in the present litigation.

16.    The Devices the FDA permitted Wright to distribute by way of the above-referenced 510(k) process included a modular neck component that had been designed and, since approximately 1985, had been distributed in Europe by Cremascoli.

17.    The FDA never considered and approved the safety of the PRO FEMUR® Total Hip System, but instead concluded only that the Device was substantially equivalent to an already legally marketed device, i.e., the Cremascoli modular neck device.

18.    Sometime after December 13, 2000, Wright began to manufacture, label, market, promote, distribute, and sell in the United States the Wright Medical Profemur hip system and its components, including the Profemur modular necks.

19.    The Wright Medical Profemur modular necks that were distributed after December 13, 2000, and before August 25, 2009, were all made of a titanium aluminum-vanadium alloy known as Ti6A14V.

20.    On August 25, 2009, pursuant to a subsequent Section 510(k) Premarket Notification (No. K091423), the FDA permitted Wright to distribute and

market a Profemur device manufactured from cobalt chrome alloy instead of Ti6Al4V, concluding - without assessing the safety of the device - only that the cobalt chrome alloy device is "substantially equivalent" to the Ti6A14V device.

21. The Wright Medical Profemur modular necks, as promoted, marketed, distributed and sold in the United States after December 13, 2000, for use with various Wright Medical hip systems, were manufactured in twelve models or styles, six of those twelve were generally identified by Wright as "short" necks (i.e., Catalog #s PHA0-1202, PHA0-1212, PHA0-1222, PHA0-1232, PHA0-1242, and PHA0-1252), and six identified by Wright as "long" necks (i.e., Catalog #s PHA0-1204, PHA0-1214, PHA0-1224, PHA0-1234, PHA0-1244, and PHA0-1254).

22. In various marketing and promotional materials published and distributed by Wright from approximately the year 2002, and into the year 2005, and available to Wright's sales representatives and distributors, surgeons, patients, and the general public, Wright made the following representations, statements, claims, and guarantees about its Profemur modular necks:

> The modular neck used with the Profemur Hip has been employed by Wright Cremascoli for over 15 years. The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures. The necks are used in other Wright Cremascoli hip systems besides the Profemur Hip. <u>None of the necks has experienced a clinical failure since their inception.</u>

[emphasis added]

and,

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent #4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty. Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant <u>guarantees</u>:

- • Structural reliability
- • <u>Absence of significant micromovement</u>
- • <u>Absence of fretting corrosion</u>

[emphasis added]

[Wright Medical Technical Monograph MH688-102 ©2004]

23.    In 2001, Wright made a design change to its PROFEMUR® necks to increase the potential range of motion.

24.    In making the 2001 design change to the Profemur modular necks, Wright changed the geometry, weight, and mass of the Profemur modular necks.

25.    More than 40,000 of the above-referenced modular necks "designed in 1985," and "successfully implanted in over 50,000 patients," and for which Wright claimed, "none of the necks has experienced a clinical failure since their inception," were of the original design that existed prior to the 2001 design change.

26.    In fact, prior to the year 2001, Wright had received notice of clinical failures in the form of fractures of modular necks that had been implanted in patients in Europe.

27.    In its initial 510(k) Premarket Notification application to distribute its Profemur modular necks in the United States, Wright did not disclose to the FDA that it had notice of clinical failures in the form of modular neck fractures that had been implanted in patients in Europe.

28.    Once Wright filed its 510(k) Premarket Notification application to distribute its Profemur modular necks in the United States, Wright had a duty to report to the FDA any instances it knew of a clinical failure of its device in patients.

29.    Once Wright received permission to distribute its Profemur modular necks in the United States as a result of its 510(k) Premarket Notification application, Wright had a duty to report to the FDA any instances it knew of a clinical failure of its device in patients.

30.    Prior to January of 2005, Wright knew or received notice of clinical failures in the form of corrosion and fractures of its modular necks that had been implanted in patients in Europe.

31.    Prior to April 19, 2005, Wright did not report to the FDA any of the

instances it knew or received notice of that its Profemur modular neck had clinically failed.

32.     On or about April 19, 2005, Wright first reported to the FDA a Profemur modular neck clinical failure where the modular neck implanted in a patient had fractured.

33.     After receiving notice of the first modular neck fracture, Wright received notice of additional modular neck clinical failures in the form of fractures of the modular necks.  The plaintiff is informed and believes that the fractures were primarily caused by corrosion in the hip.

34.     The number of Profemur modular neck clinical failures in the form of fractures of the modular neck has continued to increase over time, and continues to increase to the present day, now numbering more than 300 such clinical failures.

35.     Fractures and corrosion have been reported for both the long and the short versions of the Profemur modular necks and the rate of failure is excessive compared to other hips on the market.

36.     Wright did not inform U.S. orthopedic surgeons known by Wright to have implanted its Devices of any reports or concerns about corrosion or fractures of its Profemur modular necks until a December 1, 2008, "Safety Alert" was sent to certain "medical professionals," which provided, in part, "[W]e have received reports of 43 modular neck failures as of November 21, 2008. Initial investigations have revealed several commonalities in these failures: heavyweight males, long modular necks and patient activities such as heavy lifting and impact sports."

37.     At the time Wright sent its December 1, 2008, Safety Alert, Wright in fact was aware of more than 43 modular neck failures.

38.     On or after August 25, 2009, Wright began distributing in the United States Profemur modular necks made of a cobalt chrome alloy.

39.     Profemur modular necks distributed in the United States made of cobalt chrome are made in the same twelve sizes, versions and dimensions as the

Profemur Ti6A14V modular necks.

40.   Despite the change in materials, the Profemur cobalt chrome modular necks remain susceptible to micromotion and fretting corrosion at the neck-stem junction, similar to the otherwise identical model of Pro femur Ti6A 14 V modular necks.

41.   Despite the change in materials, the Profemur cobalt chrome modular necks continue to fail (fracture) at the neck-stem junction from corrosion, cyclic loading and metal fatigue, similar to the otherwise identical model of Pro femur Ti6A 14V modular necks.

42.   Notwithstanding Defendants' knowledge, until August 2015, Defendants had never directly informed patients in the United States who received the Profemur modular necks, and have not yet experienced a modular neck fracture, that the Profemur products have experienced higher than anticipated rates of failure due to corrosion and fracture of the modular neck.

43.   Notwithstanding Defendants' knowledge, Defendants have never informed patients in the United States who received the Profemur modular necks, and have not yet experienced a modular neck fracture, that higher weight and/or higher levels of activity may place patients at an increased risk and rate of failure due to corrosion and fracture of the modular necks.

44.   Notwithstanding Defendants' knowledge, Defendants had never directly asked their sales representatives/distributors or surgeons in the United States to directly inform any surgeons/patients who used/received these modular necks that patients may be placed at an increased risk and rate of failure due to corrosion or fracture of the modular necks.

45.   Patient testimonials that have from time to time appeared on the Wright website and were available to Wright sales representatives/distributors, physicians, patients and the public from 2005 to the present, and/or that appeared in printed materials published by Wright from 2005 to the present, have represented

that patients who received Wright artificial hips have already returned or are about to return to such activities as running, jogging, snow skiing, water skiing, marathon running, tennis, racquetball, golf, horseback riding, work that involves lifting and moving of heavy objects, active military duty in Iraq, karate, competitive wrestling and competitive 19 motocross racing, among other activities.

46.    Patient testimonials that have from time to time appeared on the Wright website, and in printed materials published by Wright from 2005 to the present, have been from men who received the Devices and weighed in excess of 250 pounds.

47.    On September 28, 2015, the FDA issued a Class 1 hip replacement recall of the Profemur Long Cobalt Chrome neck component, and advised patients to seek immediate medical treatment if they experience a sudden onset of severe pain in their post-operative hip.

## PLAINTIFF KIMBERLY BURKHART'S PROFEMUR® DEVICE

48.    Plaintiff Kimberly Burkhart brings this product liability personal injury action as a recipient of a defective medical device, i.e., a modular prosthetic hip, designed, manufactured, and distributed by Defendants.

49.    On or about February 12, 2013, Plaintiff Kimberly Burkhart had left total hip arthroplasty, at which time she had the Device properly implanted by Jason C. Snibbe, M.D., at Cedars-Sinai Medical Center of Los Angeles, California. Specifically, Plaintiff received the Profemur Z stem with a "VV" Long neck, model PHAC-1254, made from cobalt chrome alloy.

50.    When Plaintiff Kimberly Burkhart had the Device implanted, she was an appropriate patient to be implanted with this hip system.

51.    Subsequent to the date of implant, Plaintiff Kimberly Burkhart used her Device in a normal and expected manner.

52.    On July 25, 2017, Plaintiff Kimberly Burkhart's failed Device was surgically removed by Jason Snibbe, M.D. at Cedars-Sinai Medical Center of Los

Angeles, California, in a surgical procedure commonly called a "revision".  Intra-operative findings include: (1) large areas of necrosis, (2) large effusion within the hip of a slightly cloudy fluid, (3) areas of gray-stained tissues significant with metallosis, (4) erosion around the proximal portion of the femoral stem circumferentially, (5) large amount of corrosion at the femoral neck insertional portion that fits into the stem, (6) pocket of the stem showed large amounts of corrosion; and, (7) no signs of implant loosening or infection.

53.    At the time the Device was implanted in Plaintiff Kimberly Burkhart, it was in the same condition in all relevant respects as when it left Defendants' control.

54.    The PROFEMUR® Total Hip System (and its components) implanted in Plaintiff Kimberly Burkhart was not merchantable, but was unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

A.    It was and is unreasonably dangerous as a result of one or more of a combination of the following:

(1)    the neck was designed in such a manner as to be subjected to excessive micromotion and fretting corrosion, thereby increasing the potential for failure;

(2)    the surface of the section of the neck that was inserted into the femoral stem was designed in such a manner as to increase the potential for fretting and corrosion and failure;

(3)    the portion of the neck that was inserted in the femoral stem was in a narrow, confined space, thereby increasing the potential for fretting, corrosion and failure;

(4)    the components were designed in such a way as to make the modular neck component susceptible to fretting and corrosion, thereby increasing the potential for failure;

(5)    the components were designed in such a way as to make the

modular neck component susceptible to fatigue fractures;

(6) the risk of corrosion and/or neck fracture outweighed the utility of the Device;

(7) a reasonably prudent manufacturer or seller, given knowledge of the Device's condition, would not have marketed or sold the Device; and

(8) there may be other conditions or defects yet to be determined.

B.     It was dangerous to an extent beyond which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

(1) the ordinary consumer would not contemplate that the system would corrode or catastrophically fail within less than eight years after implantation; and

(2) the ordinary consumer would not contemplate that the ordinary activities of daily living would result in corrosion or the system catastrophically failing within less than eight years after implantation.

55.     The Device is not designed to withstand the normal activities of daily living after implantation without premature failure from fatigue fractures.

56.     The Device is not designed to withstand the normal activities of daily living after implantation in active or heavier weight patients without premature failure from fatigue fractures.

57.     The Device was not tested in design and development at the level of forces that were known would be encountered in the normal activities of daily living.

58.     The Device was not tested in design and development at the level of forces that were known would be encountered in the normal activities of daily living of active or heavier weight patients.

59.     The Device was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in

the normal activities of daily living.

60.     The Device was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the normal activities of daily living of active or heavier weight patients.

61.     The Device was not tested in design and development at the level of forces equal to the level of activities of patients that Defendants promoted and marketed these devices to.

62.     The Device was not tested for the FDA section 510(k) Premarket Notification Process at the forces equal to the level of activities of patients that Defendants promoted and marketed these devices to.

63.     The Device was known by Defendants to be failing from fatigue fractures of the modular necks prior to the date of its FDA section 51 0(k) Premarket Notification application.

64.     The Device was known by Defendants to be failing from fatigue fractures of the modular necks prior to December 13, 2000, the date it received permission from the FDA to distribute these devices in the United States.

65.     The Device was known by Defendants to be failing at higher than expected rates from fatigue fractures of the modular necks prior to the date of its implantation in Plaintiff Kimberly Burkhart.

66.     The Device was known by Defendants to be failing at higher than expected rates from fatigue fractures of the modular necks prior to July 25, 2017, the date of Plaintiff's revision surgery.

67.     Prior to the implant of the Device in Plaintiff Kimberly Burkhart, Defendants did not warn patients, surgeons, customers, or its sales representatives/distributors that the Device was known to be failing from fatigue fractures at higher than expected rates.

68.     Prior to the implant of the Device in Plaintiff Kimberly Burkhart, Defendants did not warn patients, surgeons, customers, or its sales

representatives/distributors that the Device was known to suffer from corrosion and/or fracture at higher than expected rates.

69.    Prior to August 2015, Defendants did not warn patients that the Profemur modular neck was known to be suddenly and catastrophically failing without warning from fatigue fractures during normal activities of daily living.

70.    Prior to August 2015, Defendants did not warn patients that the Profemur modular neck was known to be suddenly and catastrophically failing without warning from fatigue fractures in high activity or heavier weight patients.

71.    On or about July 25, 2017, Plaintiff's PROFEMUR® Total Hip System had to be revised as a result of one or more or a combination of the foregoing unreasonably dangerous conditions.

72.    As a direct and proximate result of the failure of the PROFEMUR® Total Hip System, Plaintiff Kimberly Burkhart has sustained injuries and damages including, but not limited to:

    (a)    undergoing surgery to remove and replace the failed prosthesis system;

    (b) past and future pain and anguish, both in mind and in body;

    (c) permanent diminishment of her ability to participate in and enjoy the affairs of life;

    (d) medical bills associated with the replacement procedure and recovery therefrom;

    (e) future medical expenses;

    (f) loss of enjoyment of life;

    (g) loss of past and future earnings and earning capacity;

    (h) disfigurement; and

    (i) physical impairment.

/ / /

/ / /

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### STRICT PRODUCTS LIABILITY - MANUFACTURING DEFECT
### (Against Wright Defendants)

73.   Plaintiff repeats, re-alleges, and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 72 above, inclusive, as though fully set forth herein.

74.   At all times relevant hereto, Wright designed, manufactured, distributed, sold, marketed, and promoted the PROFEMUR® Total Hip System that was implanted in Plaintiff on or about February 12, 2013.

75.   At all times relevant hereto, the PROFEMUR® Total Hip System was expected to, and did, reach prescribing physicians and consumers, including Plaintiff Kimberly Burkhart and Plaintiff's physician, without a substantial change in the condition in which it was sold.

76.   At all times relevant hereto, Plaintiff Kimberly Burkhart and Plaintiff's healthcare providers used the PROFEMUR® Total Hip System for its intended or reasonably foreseeable purpose.

77.   At all times relevant hereto, the PROFEMUR® Total Hip System was dangerous, unsafe, and defective in manufacture. Such defects included, but were not limited to an unreasonably high propensity for corrosion, fretting, and fatigue under normal and expected use of the device, leading to fracture of the modular neck and catastrophic failure of the device, requiring revision surgery.

78.   Plaintiff Kimberly Burkhart is informed and believes, and thereupon alleges, that the PROFEMUR® Total Hip System implanted in Plaintiff was defectively manufactured because it differed from the manufacturer's design and specifications, or from typical units of the same product line.

79.   As a direct, legal, proximate, and producing result of the defective manufacture of the PROFEMUR® Total Hip System implanted in Kimberly

Burkhart sustained as set forth above.

80.     The dangerous, unsafe, and defective manufacturing of the PROFEMUR® Total Hip System implanted in Plaintiff Kimberly Burkhart was a substantial factor in causing Plaintiff's injuries as set forth above.

## SECOND CLAIM FOR RELIEF
## STRICT PRODUCTS LIABILITY - F1AILURE TOW ARN
### (Against All Defendants)

81.     Plaintiff repeats, re-alleges, and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 80 above, inclusive, as though fully set forth herein.

82.     The PROFEMUR® Total Hip System was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert the medical community and patients, including Plaintiff and Plaintiff's healthcare providers, to the dangerous risks associated with the PROFEMUR® Total Hip System when used for its intended and reasonably foreseeable purpose. The dangers and risks included, but were not limited to an unreasonably high propensity for corrosion, fretting, and fatigue under normal and expected use of the device, leading to fracture of the modular neck and catastrophic failure of the device, requiring revision surgery.

83.     At all times relevant hereto, Plaintiff and Plaintiff's healthcare providers used the PROFEMUR® Total Hip System for its intended or reasonably foreseeable purpose.

84.     Plaintiff and Plaintiff's healthcare providers could not have discovered any defect in the PROFEMUR® Total Hip System through the exercise of due care.

85.     Defendants knew or should have known, by the use of scientific knowledge available before, at, and after the time of manufacture, distribution, and sale of the PROFEMUR® Total Hip System, of potential risks and side effects associated with the PROFEMUR® Total Hip System. Defendants knew or should

have known of the defective condition, characteristics, and risks associated with said product, as previously set forth herein.

86.    The warnings and instructions provided with the PROFEMUR® Total Hip System by Defendants did not adequately warn of the potential risks and side effects of the PROFEMUR® Total Hip System, which risks were known or scientifically knowable to Defendants.

87.    Defendants had a continuing duty to warn the medical community and public, including Plaintiff and Plaintiff's healthcare providers, of the potential risks and increased failure rate associated with the PROFEMUR® Total Hip System.

88.    As a direct, legal, proximate, and producing result of Defendants' failure to warn, Plaintiff sustained injuries as set forth above.

89.    Defendants' failure to adequately warn of the potential risks and side effects of the PROFEMUR® Total Hip System was a substantial factor in causing Plaintiffs injuries as set forth above.

### THIRD CLAIM FOR RELIEF
### NEGLIGENCE
**(Against All Defendants)**

90.    Plaintiff repeats, re-alleges, and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 89 above, inclusive, as though fully set forth herein.

91.    At all times relevant hereto, Defendants designed, manufactured, distributed, sold, marketed, and promoted the PROFEMUR® Total Hip System for implantation into customers, such as Plaintiff, by physicians and surgeons in the United States.

92.    At all times relevant hereto, Defendants knew or should have known that the novel design of the PROFEMUR® Total Hip System necessitated clinical trials and other pre-marketing evaluations of risk and efficacy. Such testing would have revealed the increased risk of failure and complications associated with the

PROFEMUR® Total Hip System. A reasonable manufacturer under the same and similar circumstances would have conducted additional testing and evaluation of the PROFEMUR® Total Hip System's safety and performance prior to placing the PRO FEMUR® Total Hip System into the stream of commerce.

93.    At all times relevant hereto, Defendants knew or should have known of the serious complications and high failure rate associated with the PRO FEMUR® Total Hip System. Despite receiving hundreds of reports of serious complications from healthcare providers, Defendants chose (1) not to perform any additional testing of the PROFEMUR® Total Hip System; (2) not to investigate other potential causes of the complications; (3) not to suspend sales or distribution; and (4) not to warn physicians and patients of the PROFEMUR® Total Hip System's unreasonably high propensity for corrosions, fretting and fatigue under normal and expected use of the device, leading to fracture of the modular neck and catastrophic failure of the device, requiring revision surgery.

94.    As a direct, legal, proximate, and producing cause of Defendants' negligent design, testing, manufacturing, marketing, selling, and promoting the PROFEMUR® Total Hip System, Plaintiff suffered injuries as set forth above.

95.    Defendants' negligent design, testing, manufacturing, selling, and promoting the PROFEMUR® Total Hip System, was a substantial factor in causing Plaintiffs injuries as set forth above.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENCE - FAILURE TO RECALL/RETROFIT
### (Against All Defendants)

96.    Plaintiff repeats, re-alleges, and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 95 above, inclusive, as though fully set forth herein.

97.    At all times relevant hereto, Defendants knew or should have known that the design of the PROFEMUR® Total Hip System and its warnings were likely

to be dangerous when used in an intended or reasonably foreseeable manner.

98.   Despite the severity and number of complaints Defendants received, Defendants failed to recall, retrofit, or warn patients or physicians about the danger of the PROFEMUR® Total Hip System until February 12, 2013.

99.   Reasonable manufacturers, distributors, sellers, promoters, and designers under the same or similar circumstances would have recalled the PROFEMUR® Total Hip System earlier than February 12, 2013.

100.   As a direct, legal, proximate, and producing result of Defendants' failure to recall the PROFEMUR® Total Hip System earlier than February 12, 2013, Plaintiff suffered injuries as set forth above.

101.   Defendants' failure to recall the PROFEMUR® Total Hip System sooner was a substantial factor in causing Plaintiffs injuries as set forth above.

**FIFTH CLAIM FOR RELIEF**
**FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

102.   Plaintiff repeats, re-alleges, and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 101 above, inclusive, as though fully set forth herein.

103.   The Defendants falsely and fraudulently represented to the medical and healthcare community, and to Plaintiff, Plaintiff's healthcare providers, and/or the FDA, that the PROFEMUR® Total Hip System had been properly tested and was safe and effective for its indicated use.

104.   The representations made by Defendants to the medical and healthcare community, and to Plaintiff, Plaintiff's healthcare providers, and/or the FDA, regarding the safety and performance of the PROFEMUR® Total Hip System were, in fact, false.

105.   Defendants knew or should have known that the PRO FEMUR® Total Hip System had not been sufficiently tested, was defectively designed, and lacked

adequate warnings and instructions.

106.   Defendants knew or should have known that the PRO FEMUR® Total Hip System could and would cause severe and grievous injury to users of said product, and that the PROFEMUR® Total Hip System's inherent dangers exceeded any purported, inaccurate, and/or downplayed warnings.

107.   When said representations were made by Defendants, Defendants knew those representations to be false and exhibited a willful, wanton, and reckless disregard for the truth of said representations.

108.   Said representations were made by Defendants with the intent to defraud and deceive Plaintiff, Plaintiff's healthcare providers, the medical community, and the general public. Defendants intended said representations to induce Plaintiff, Plaintiff's healthcare providers, the medical community and the general public, to recommend, implant, and/or purchase the PROFEMUR® Total Hip System for use as part of total hip replacement surgery. Defendants' actions evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff.

109.   At all relevant times, Plaintiff and Plaintiff's healthcare providers were unaware of the falsity of said representations and reasonably believed them to be true.

110.   In reliance upon Defendants' representations, Plaintiff was induced and did use the PROFEMUR® Total Hip System, thereby sustaining severe and permanent personal injuries, and is now at an increased risk of sustaining severe and permanent personal injuries in the future.

111.   Defendants brought the PROFEMUR® Total Hip System to the market, and acted fraudulently, wantonly, and maliciously to the detriment of Plaintiff.

112.   As a direct, legal, proximate, and producing result of Defendants' false representations, Plaintiff suffered the injuries set forth herein.

### SIXTH CLAIM FOR RELIEF
### FRAUDULENT CONCEALMENT
### (Against All Defendants)

113.   Plaintiff repeats, re-alleges, and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 112 above, inclusive, as though fully set forth herein.

114.   Defendants knew their representations were false or recklessly disregarded the truth of said representations.

115.   In representations to Plaintiff, Plaintiff's healthcare providers, and/or the FDA, Defendants omitted, concealed or suppressed material information regarding the safety and performance of the PROFEMUR® Total Hip System, including, but not limited to:

(a)   An unreasonably high propensity for corrosion, fretting and fatigue under normal and expected use for the device, leading to fracture of the modular neck and catastrophic failure of the device, requiring revision surgery.

(b)   That the PROFEMUR® Total Hip System had an unacceptably high rate of failures requiring revision surgery;

(c)   That the safety and performance of the PROFEMUR® Total Hip System was not adequately tested and/or known by Defendants;

(d)   That patients implanted with the PROFEMUR® Total Hip System were at increased risk of experiencing painful and debilitating product failure and were more likely to undergo revision surgery than patients using other hip implant devices;

(e)   The PROFEMUR® Total Hip System was designed, manufactured, marketed, promoted, distributed, and sold negligently, defectively, and/or improperly;

(f)   That safer alternatives were available.

116.  Defendants purposefully downplayed and understated the serious nature of the risks associated with the use of the PROFEMUR® Total Hip System in order to increase and sustain sales.

117.  Defendants had sole access to material facts regarding the safety and performance of the PROFEMUR® Total Hip System. Defendants know Plaintiff and Plaintiff's healthcare providers and/or the FDA had no way to determine the truth behind Defendants' concealment, omission, and suppression of material facts as set forth herein.

118.  Plaintiff and Plaintiffs healthcare providers relied on Defendants' incomplete and inaccurate representations as to the safety and performance of the PROFEMUR® Total Hip System when selecting, recommending, and implanting the PROFEMUR® Total Hip System.

119.  As a direct, legal, proximate, and producing result of Defendants' concealment of material facts, Plaintiff has suffered injuries as set forth herein.

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENT MISPRESENTATION
### (Against All Defendants)

120.  Plaintiff repeats, re-alleges, and hereby incorporates by reference all of the allegations and statements contained in Paragraphs 1 through 119 above, inclusive, as though fully set forth herein.

121.  Defendants had a duty to truthfully represent to the medical community, and to Plaintiff, Plaintiffs healthcare providers, and the FDA, that the PROFEMUR® Total Hip System was properly tested and found to be safe and effective for its intended use.

122.  Defendants knew or should have known that their representations regarding the safety and performance of the PROFEMUR® Total Hip System were, in fact, false.

123.  Defendants failed to exercise ordinary care in determining the truth or

falsity of their representations and by misrepresenting the safety and performance of the PROFEMUR® Total Hip System.

124. Defendants breached their duty to present truthful representations by knowingly, or by want of ordinary care, misrepresenting the safety and performance of the PROFEMUR® Total Hip System.

125. As a direct, legal, proximate, and producing result of Defendants' concealment of material facts, Plaintiff has suffered injuries as set forth herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and/or severally, as follows:

1. For general damages for personal injuries to Plaintiff, according to proof;

2. For all past, current, and future medical and incidental expenses, according to proof;

3. For all loss of earnings, present and future, and loss of earning capacity, according to proof;

4. For punitive and/or exemplary damages in an amount sufficient to punish Defendants and deter similar conduct in the future, according to proof;

5. For prejudgment interest, as provided by law;

6. For reasonable attorneys' fees;

7. For costs of litigation; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1          8.     For such other and further relief as this Court may deem just and

2    proper.

3

4    Dated: November 27, 2017.            KERSHAW, COOK & TALLEY PC

5

6                             By:   */s/ Stuart C. Talley*
                                 Stuart C. Talley

7

8                            William A. Kershaw
                        401 Watt Avenue

9                            Sacramento, California 95864
                        Telephone: (916) 779-7000

10                           Facsimile: (916) 721-2501
                        Email: bill@kctlegal.com

11                           Email: stuart@kcrtegal.com

12                           Osborne & Associates Law Firm, P.A.
                        Joseph A. Osborne

13                           433 Plaza Real, Suite 271
                        Boca Raton, FL 33432

14                           Telephone: (561) 293-2600
                        Facsimile:  (561) 923-8100

15                           Email: josborne@oa-lawfirm.com

16

17                           *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury to the full extent permitted by law.

Dated: November 27, 2017.                  KERSHAW, COOK & TALLEY PC


By:   */s/ Stuart C. Talley*
         Stuart C. Talley

William A. Kershaw
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 721-2501
Email: bill@kctlegal.com
Email: stuart@kcrtegal.com

Osborne & Associates Law Firm, P.A.
Joseph A. Osborne
433 Plaza Real, Suite 271
Boca Raton, FL 33432
Telephone: (561) 293-2600
Facsimile:  (561) 923-8100
Email: josborne@oa-lawfirm.com

*Attorneys for Plaintiff*